

**FILED**

NOV 21 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GEORGE MOORE,

      Plaintiff,

v.

AJT DIABETIC INCORPORATED,
ROBIN SOBLICK and DOES 1 – 10,

      Defendants.

Case No.

**1:19-cv-07707
Judge Jorge L. Alonso
Magistrate Judge Gabriel A. Fuentes**

## COMPLAINT

Plaintiff George Moore states as follows for his complaint against AJT Diabetic Incorporated,
Robin Soblick and Does 1 – 10:

### Preliminary Statement

1.     This action arises out of the Defendants' repeated violations of the Telephone
Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA").

2.     Does 1 through 10 initiated autodialed calls to the residential telephone numbers
of Plaintiff despite them being registered on the National Do Not Call Registry, to promote AJT
Diabetic Incorporated ("AJT") in violation of the TCPA. AJT hired Does 1 through 10 to
advertise its goods and services and is vicariously liable for their illegal telemarketing conduct.

3.     This Complaint also relates to Defendants' conduct making telemarketing calls to
the Plaintiff without transmitting valid caller IDs and in the absence of any "do not call" policy
or training, as well as making such calls to the Plaintiff after he indicated that he no longer
wanted to be contacted.

## PARTIES

4.     Plaintiff George Moore is a natural person and resident of Illinois in this District.

5.     Defendant AJT Diabetic Incorporated is a Texas Corporation, which is authorized to do business in Illinois, and has its principal office in Houston, Texas.  AJT has a registered agent of Illinois Corporation Service Company, 801 Adlai Stevenson Dr, Springfield, IL 62703.

6.     Defendant Robin Soblick is a natural person and resident of the State of Florida.

7.     She is AJT's president.

8.     The true names and capacities of the defendants sued herein as Does 1 through 10 are currently unknown to Plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as Does when such identities become known.

9.     The Defendants themselves, and through third parties, place telemarketing calls into this District, or authorized the same, as they did with the Plaintiff.

## JURISDICTION & VENUE

10.     The Court has federal question subject matter jurisdiction over these TCPA claims.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)( 2) because Plaintiff Moore is a resident of this district, which is where he received the illegal telemarketing calls that are the subject of this lawsuit.

## TCPA BACKGROUND

12.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]"  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

2

The TCPA Prohibits Automated Telemarketing Calls

13.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service". *See* 47 U.S.C. § 227(b)(1)(A)(iii).

14.    The TCPA provides a private cause of action to persons who receive such calls. *See* 47 U.S.C. § 227(b)(3).

15.    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

16.    In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd 1830, 1844 (2012) (footnotes omitted).

The TCPA's Requirement to Have Sufficient Policies In Order to Honor Requests to Stop
Contacting Individuals.

17.     The TCPA specifically required the FCC to "initiate a rulemaking proceeding
concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving
telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

18.     The FCC was instructed to "compare and evaluate alternative methods and
procedures (including the use of … company-specific 'do not call' systems …)" and "develop
proposed regulations to implement the methods and procedures that the Commission determines
are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

19.     Pursuant to this statutory mandate, the FCC established company-specific "do not
call" rules. *In the Matter of Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991*, 7 FCC Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

20.     The FCC found that "the company-specific do-not-call list alternative is the most
effective and efficient means to permit telephone subscribers to avoid unwanted telephone
solicitations." *Id.* at 8765 (¶ 23).

21.     However, recognizing that an honor system would probably be insufficient, the
FCC found that it "must mandate procedures for establishing company-specific do-not-call lists
to ensure effective compliance with and enforcement of the requirements for protecting
consumer privacy." *Id.* at ¶ 24.

22.     It accordingly placed the burden on telemarketers to implement and prove the
implementation of their compliance procedures.

23.     These regulations are codified at 47 C.F.R. § 64.1200(d)(1)-(7).

24.     Specifically, these regulations require a company to keep a written policy,
available upon demand, for maintaining a do-not-call list, train personnel engaged in

4

telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. § 64.1200(d)(1, 2, 3, 6).

25.     These regulations prohibit a company from making telemarketing calls unless it has implemented these policies and procedures. 47 C.F.R. § 64.1200(d).

26.     Accordingly, all telemarketing calls violate the TCPA, unless Defendants can demonstrate that they have implemented the required policies and procedures.

The TCPA Prohibits Caller ID Spoofing

27.     In 2003, the FCC supplemented the TCPA's company-specific do-not-call rules with the requirement that sellers and telemarketers transmit valid caller ID information. *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14121 (2003).

28.     In establishing these and other accompanying regulations, the FCC noted that section 227(c) of the TCPA requires it to "consider *several* methods to accommodate telephone subscribers who do not wish to receive…live voice solicitations . . . individually or *in combination*…" *Id.* at 14019 (¶ 5) (emphasis added).

29.     The FCC was specifically instructed to consider "telephone network technologies" as one of these methods. *See* 47 U.S.C. § 227(c)(1)(A).

30.     Under this directive, the FCC set out to determine whether network technologies had been developed over the last decade that may allow consumers to avoid receiving unwanted telephone solicitations. *Id.* at 14118 (¶ 174).

31.     Recognizing that Caller ID allows consumers to screen out unwanted calls, and that current technology enables telemarketers to transmit this information cost effectively, the

FCC thus ordered that sellers and telemarketers must transmit valid caller ID. *Id.* at 14121 (¶ 179).

32.    These regulations are codified at 47 C.F.R. § 64.1601(e)(1)-(3).

33.    Specifically, these regulations require telemarketers to transmit a caller ID number that "permit[s] any individual to make a do-not-call request during regular business hours".  47 C.F.R. § 64.1601(e)(1).

34.    Consequently, telemarketing calls made using spoofed caller IDs violate the TCPA.

The National Do Not Call Registry

35.    The TCPA prohibits making multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry.  *See* 47 U.S.C. § 227(c)(5).

**FACTUAL ALLEGATIONS**

36.    AJT is in the business of selling medical equipment and supplies.

37.    One of AJT's strategies for marketing its goods and generating new customers is telemarketing.

38.    AJT's telemarketing involves the use of automatic telephone dialing equipment, including predictive dialers.

39.    The Defendants use this equipment because it allows for numerous calls to be placed at one time, but AJT's telemarketing representatives, who are paid by the hour, only talk with individuals who answer such calls.

40.    Upon information and belief, AJT targets consumers enrolled in Medicare insurance plans, in order to seek reimbursement from such plans for the goods dispensed to AJT customers acquired through telemarketing.

6

**Calls to Mr. Moore**

41.     Beginning in May 2019, Plaintiff Mr. Moore started receiving repeated telemarketing calls on his residential telephone numbers (630) 510-XXXX and (630) 699-XXXX, regarding the availability of an upgraded medical device for persons suffering from diabetes.

42.     Both numbers have been continuously registered on the National Do Not Call Registry for more than ten years prior to receipt of the calls.

43.     All the calls that the Plaintiff answered from the Defendants followed a common pattern.

44.     The Plaintiff would answer the call.

45.     There would be a noticeable pause with silence.

46.     Then a loud "bloop" sound would play.

47.     The pause and "bloop" are consistent with the algorithm of a predictive dialer as it attempts to connect the called party, who has already answered, with an available live agent.

48.     The caller ID numbers on the calls were not related to AJT or their telemarketer that made the call.

49.     The caller ID numbers would be local to the Plaintiff, with the same area code and prefix as Plaintiff's phone number, and the remaining digits seemingly random and different for each call.

50.     To program caller ID numbers in this manner typically takes a computer program associated with ATDS equipment.

51.     Such equipment similarly has the capacity to randomly or sequentially generate numbers to be called.

7

52.     When a live person eventually came on the line, the representative would identify his company as "National Diabetic Center", "Diabetic Supplies Team" or another similar generic name.

53.     The representative would ask Plaintiff the same health questions.

54.     The representative would then offer the Plaintiff an upgraded blood glucose meter, stating that it would be covered in full by Plaintiff's insurance with no out-of-pocket cost.

55.     The purpose of these calls was to promote AJT's goods and services.

56.     The Defendants initiated such calls to Plaintiff's residential landline on July 27 and 31, 2019.

57.     The Plaintiff had not consented to receive these calls.

58.     Mr. Moore was not interested in the medical device being offered.

59.     However, the calls continued.

60.     In order to identify the company whose goods were being promoted, Mr. Moore attempted to listen to the entire telemarketing pitch.

The September 14, 2019 Call

61.     On September 14, 2019, the Plaintiff received a telemarketing call on his residential number (630) 510-XXXX, from caller ID (630) 510-3087.

62.     When Plaintiff answered, he heard an unnatural pause and "bloop" sound before a live person came on the line.

63.     The representative identified his company as "National Diabetic Center".

64.     The Plaintiff was offered an upgraded type of blood glucose meter which the representative stated would be covered in full by Plaintiff's insurance with no out-of-pocket cost.

65.     The representative proceeded to transfer the call to a second representative.

8

66.     In order to investigate, the Plaintiff feigned interest in the medical equipment being offered.

67.     The Plaintiff was asked to confirm that he is enrolled with Medicare.

68.     The Plaintiff was asked for the name of his physician, so that the Defendants would be able to fax an order form to the physician and obtain a signed prescription.

69.     Finally, at the conclusion of the call, the representative identified AJT Diabetic as the company whose goods were being advertised.

Calls to Mr. Moore's Cellular Number

70.     The Plaintiff received identical calls on his cellular line.

71.     For example, on July 6, 2019, the Plaintiff received a telemarketing call from the Defendants on his residential number (630) 699-XXXX.

72.     This number is assigned to a cellular telephone service.

73.     The Plaintiff had not consented to receive this call.

74.     The caller ID of the received call was (630) 699-2082.

75.     When Plaintiff answered, he heard an unnatural pause and "bloop" sound before a live person came on the line.

76.     The representative identified his company as "National Diabetic Center".

77.     The Plaintiff was offered an upgraded type of blood glucose meter which the representative stated would be covered in full by Plaintiff's insurance with no out-of-pocket cost.

78.     The representative offered to transfer the call to a delivery representative.

Mr. Moore's Do Not Call Request

79.     On September 20, 2019, the Plaintiff sent an e-mail to AJT and Ms. Soblick regarding the illegal telemarketing calls.

9

80. The Plaintiff requested a copy of AJT's do-not-call policy and indicated that he no longer wanted to be contacted.

81. The Plaintiff did not receive a response.

82. Despite his request, the Plaintiff continued to receive calls.

83. The Plaintiff received more than 20 telemarketing calls from the Defendants on his residential numbers after the e-mail he sent.

84. Plaintiff has been injured by the acts of the Defendants because his privacy has been violated and he was subjected to annoying and harassing calls that constitute a nuisance. Plaintiff was also temporarily deprived of legitimate use of his phone because the phone line was tied up by the illegal calls.

## DEFENDANTS' LIABILITY FOR THE TELEMARKETING CALLS

85. AJT is a "person", as defined by 47 U.S.C. § 153(39).

86. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

87. In its January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations.

88. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers such as AJT may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the

telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

89.    More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 (¶ 34).

90.    The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

91.    AJT is legally responsible for ensuring that the parties that made the calls complied with the TCPA, even if AJT did not itself make the calls.

92.    AJT knowingly and actively accepted business that originated through the illegal telemarketing calls from the parties that made the calls.

93.    Furthermore, AJT maintained interim control over the actions of the parties that made the calls.

94.    For example, AJT had absolute control over whether, and under what circumstances, it would accept a customer.

95.    Additionally, AJT instructed the parties that made the calls to transfer the called parties to an AJT representative tasked with completing the process of enrolling a customer for delivery of medical supplies.

96.    AJT also gave interim instructions to the parties that made the calls by providing

11

(1) the volume of calling and leads it would purchase; and (2) the timing of when AJT telephone representatives would be available to field a prospect.

97.     Moreover, AJT continued its relationship with the parties that made the calls after Mr. Moore informed AJT and Ms. Soblick about the illegal telemarketing calls.

98.     AJT also ratified the conduct of the parties that made the calls by accepting the benefits of the telemarketing conduct even though it was aware that these parties were making the telemarketing calls at issue.

Ms. Soblick's Liability for the Telemarketing Calls

99.     During all relevant times, Defendant Ms. Soblick directed the day-to-day activities of AJT as the company's president.

100.    When considering individual officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See, e.g.*, *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

101.    Ms. Soblick is personally liable under the "participation theory" of liability because she was a controlling officer of AJT and knew of and authorized the telemarketing conduct that is the subject of this Complaint.

## COUNT I
## VIOLATION OF THE TCPA'S DO NOT CALL PROVISIONS

102.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set

forth herein.

103.    The Defendants violated the TCPA by (a) initiating multiple telephone solicitations within a 12-month period to the Plaintiff's residential telephone numbers that are registered on the Do Not Call Registry, or (b) by the fact that others made those calls on their behalf. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

104.    The Defendants' violations were willful and/or knowing.

## COUNT II
## VIOLATION OF THE TCPA'S AUTOMATED CALL PROVISIONS

105.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

106.    The Defendants violated the TCPA by (a) initiating telephone calls to the Plaintiff's cellular number using an automatic telephone dialing system, or (b) by the fact that others made those calls on their behalf. *See* 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(1).

107.    The Defendant's violations were willful and/or knowing.

## COUNT III
## VIOLATIONS OF THE TCPA'S INTERNAL DO NOT CALL PROVISIONS

108.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

109.    Defendants placed numerous calls for telemarketing purposes to Plaintiff's residential telephone numbers.

110.    Defendants did so despite not having a written policy pertaining to "do not call" requests.

111.    Defendants did so despite not training their personnel on the existence or use of any internal "do not call" list.

13

112.    Defendants did so despite not recording or honoring "do not call" requests.

113.    The Defendants violated the TCPA by (a) initiating calls for telemarketing purposes to the Plaintiff without having instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of the Defendants, or (b) by the fact that others made those calls on their behalf. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d).

114.    The Defendants' violations were willful and/or knowing.

**COUNT IV**
**VIOLATION OF THE TCPA'S CALLER ID PROVISIONS**

115.    Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

116.    The Defendants violated the TCPA by (a) initiating calls for telemarketing purposes to the Plaintiff without transmitting caller identification information containing a telephone number that permits any individual to make a do-not-call request during regular business hours, or (b) by the fact that others made those calls on their behalf. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1601(e)(1).

117.    The Defendants' violations were willful and/or knowing.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays that judgment be awarded in Plaintiff's favor and against the Defendants, jointly and severally, as follows:

A.    Because of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(c), treble damages, as provided by statute, of up to $1,500 for every call that violated the TCPA;

B.    Because of Defendants' statutory violations of 47 U.S.C. § 227(c), $500 in statutory damages for every call that violated the TCPA;

14

C.      Because of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(b), treble damages, as provided by statute, of up to $1,500 for every call that violated the TCPA;

D.      Because of Defendants' statutory violations of 47 U.S.C. § 227(b), $500 in statutory damages for every call that violated the TCPA;

E.      Costs of suit;

F.      Leave to amend this Complaint to name Does as they are identified and to conform to the evidence presented at trial;

G.      Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

RESPECTFULLY SUBMITTED,

GEORGE MOORE,
Pro Se

DATED:  November 21, 2019     By: _____

George Moore
906 Chatham Drive
Carol Stream, IL 60188
Email: gmoore3@att.net
Telephone: (630) 699-3205